UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. |
| | ) | |
| FUNDS IN THE AMOUNT OF $65,000 | ) | |
| UNITED STATES CURRENCY; and | ) | |
| | ) | |
| FUNDS IN THE AMOUNT OF | ) | |
| $23,790 UNITED STATES CURRENCY, | ) | |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

**VERIFIED COMPLAINT FOR FORFEITURE**

COMES NOW, before this honorable Court, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to the provisions of Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Fed. R. Civ. P. Supp.") G(2), respectfully, to bring this Verified Complaint for Forfeiture *In Rem.*

Plaintiff hereby alleges as follows:

**Nature of the Action**

1. This is a civil action brought to forfeit property seized by the United States government for violations of federal law that provide for the seizure, forfeiture, and disposal of certain property to the United States.

2. This action is an *in rem* legal proceeding against property, not against an individual, to determine rights in the property that are conclusive against the entire world.

3. This civil action *in rem* is brought to forfeit property pursuant to the provisions of 21 U.S.C. § 881(a)(6), 18 U.S.C. §§ 981(a)(1)(A), and 981(a)(1)(C), because it: (1) was involved in, (2) was used or intended to be used to facilitate, (3) was furnished or intended to be furnished in exchange for, or (4) is proceeds (or property) traceable to, a "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7)(A).

4. Based upon the facts and circumstances herein set forth, Plaintiff prays: (1) that process issue for an arrest warrant *in rem* for the subject property; (2) that notice be given to all parties to appear and show cause why forfeiture should not be decreed; (3) that this Court enter a judgment of forfeiture to the United States; and (4) that this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

5. This complaint is verified by the attached affidavit of Drug Enforcement Administration ("DEA") Task Force Officer Scott Opelt ("TFO Opelt"), which is fully incorporated herein.

### The Defendant *In Rem*

6. The Defendant *in rem* consists of the following property:

- $65,000 (sixty-five thousand dollars); and
- $23,790 (twenty three thousand, seven hundred and ninety dollars) in United States currency.

(Hereinafter, the "subject property").

7. The subject property was seized on October 15, 2018, by the Drug Enforcement Administration ("DEA") Group 24 Task Force ("Group 24") operating out of O'Hare International

2

Airport in Chicago, Illinois ("O'Hare Airport"), to which Task Force Officer Scott Opelt ("TFO Opelt") is assigned.

8. The subject property is currently in the custody of the United States Marshals Service.

## Jurisdictional Statement

9. This Court has jurisdiction over an action commenced by the United States of America, and pursuant to 28 U.S.C. § 1355(a) because this is an action for forfeiture.

10. This Court has *in rem* jurisdiction over the subject property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395(a) (via 28 U.S.C. § 1355(b)(1)(B)) because the subject property is located in this district.

11. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395 (via 28 U.S.C. § 1355(b)(1)(B)) because the subject property is located in this district.

## Basis for Forfeiture

12. The subject property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it: (1) was "furnished or intended to be furnished" in exchange for a controlled substance or listed chemical in violation of Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801, *et seq*. (the "Controlled Substances Act"), (2) represents "proceeds traceable" thereto, or (3) was "used or intended to be used to facilitate" a violation thereof. *See* 21 U.S.C. § 881(a)(6).

13. The subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960; to wit, "dealing in a controlled substance" under 18 U.S.C. § 1961(1)(A) and "interstate and foreign travel or transportation in aid of racketeering enterprises" under 18 U.S.C. § 1952 – "specified unlawful activit[ies]" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

14. The subject property is subject to forfeiture pursuant to 21 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from "proceeds traceable" to "dealing in a controlled substance" under 18 U.S.C. § 1961(1)(A) and "interstate and foreign travel or transportation in aid of racketeering enterprises" under 18 U.S.C. § 1952 – "specified unlawful activit[ies]" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

**Summary of Facts**

15. On October 15, 2018, DEA Group 24 conducted a consensual interview and search at O'Hare Airport, which led to the discovery and seizure of the subject property from Mark Anthony Scerbo ("Scerbo"), a passenger traveling alone on a first class, one-way ticket via United Airlines flight UA224 from Albany, New York to Chicago, Illinois with a connecting flight from Chicago, Illinois to San Francisco, California and an additional connecting flight too Eureka, California.

16. A police canine certified with the National Police Canine Association (NPCA) demonstrated as a positive alert on the subject property, indicating the presence of one of five odors he is trained to detect.

17. Based upon the experience of DEA Group 24 officer, including TFO Opelt, and

the totality of the circumstances further described below, the subject property was seized for forfeiture.

**Facts**

I.     Airport Interdiction and Discovery of the Subject Property

        A.   Overview of DEA Group 24 at O'Hare

18.     This Complaint describes an investigation conducted by members of DEA Group 24 at O'Hare Airport, to which TFO Opelt is a member.

19.     The primary responsibility of Group 24 is to investigate crimes involving the use of commercial airlines and shipping companies to transport illegal drugs and drug proceeds.

20.     Based upon the experience of Group 24 investigators and in similar investigations across the United States, it is common knowledge that cities in the mid-west and east coast are demand locations for illicit drugs.

21.     States such as California is considered a source location due to its close proximity to the border of Mexico and established drug transportation routes.

22.     Person(s) involved in the illegal drug trade, often hire couriers to transport drugs and or proceeds from the sale of drugs by utilizing commercial airlines and shipping companies.

23.     In an effort to identify and disrupt potential drug and/or money couriers related to drug organizations and criminal syndicates, investigators utilize a variety of resources, including confidential informants, suspicious flight itineraries, other law enforcement agencies, and prior knowledge of criminal activity or intelligence.

24.     Factors that constitute suspicious flight itineraries include airfare purchase at the

5

counter immediately prior to departure or short notice reservations for one-way travel, sometimes paid in cash.

25. In addition, Group 24 investigators know it is common for couriers to utilize a third party credit card to purchase airfare and to provide inaccurate or not in-service telephone numbers to airline companies.

26. Couriers travel with minimal or no luggage and often attempt to board the aircraft at the last possible moment.

27. Drug and/or money couriers utilize these techniques in an attempt to conceal their identities from law enforcement and minimize their exposure to commercial airlines.

    B. Interview with Passenger Scerbo

28. On October 15, 2018, law enforcement acted on information provided by a Confidential Source (CS) with regard to the suspicious travel itinerary of Scerbo.

29. The ticket was purchased two days prior by Individual A on October 13, 2018.

30. Based upon the training and experience of Group 24 investigators, illegal drug couriers often purchase airline tickets one day or so prior to the scheduled departure.

31. Group 24 investigators also know San Francisco, California, and the central California region in particular, to be a known source area for illegal drug trafficking.

32. Further, Group 24 investigators also know that those who transport illegal drugs, or the proceeds of illegal drug trafficking, often keep them on their person or accompanying bags or suitcases.

33. As such, Group 24 investigators sought to interview Scerbo prior to boarding United Airlines flight UA1825.

34. At approximately 12:15p.m., Group 24 investigators established surveillance near terminal 1, United Airlines gate C11 at O'Hare Airport, the gate for the outbound United Airlines flight UA1825, in an attempt to interview Scerbo.

35. At the time, the investigators were dressed in civilian clothing with no weapons, radios, or other law enforcement paraphernalia visible.

36. Shortly thereafter, TFO Opelt approached a male subject believe to be Scerbo on the jet bridge.

37. TFO Opelt identified himself as law enforcement by displaying credentials and badge.

38. The unknown male was told by TFO Opelt that he was not under arrest and was not in any kind of trouble.

39. At that time, TFO Opelt asked the male subject if he was Mark Scerbo, and the male replied "yes".

40. Scerbo agreed to speak with officers after being asked by TFO Opelt.

41. TFO Opelt asked to see a form of photo identification and a boarding pass.

42. Scerbo produced a New York driver's license bearing the name Mark A. Scerbo, which bore a photo likeness.

43. TFO Opelt noted the information and handed the identification back to Scerbo.

44. When asked where and the purpose of his travel, Scerbo stated he was traveling to San Francisco and Eureka, California.

45. TFO Opelt asked Scerbo was he traveling for business or pleasure, Scerbo advised both.

46. Scerbo advised he was traveling to visit his daughter in California.

47. TFO Opelt asked Scerbo what type of business he had in California, Scerbo advised he was in the marijuana business in California.

48. When asked if he had any checked luggage for the flight, Scerbo advised he had two checked bags.

49. Scerbo was carrying a black shoulder bag.

50. TFO Opelt asked if he had anything in any of his bags that would have caused questioning by a screener, Scerbo advised he did not.

51. When asked by TFO Opelt if his bags contained anything with wires or switches, Scerbo advised he did have some old headphones with loose wires that an airline employee had questioned in his trip as they were hanging out of one of his checked bags. Scerbo advised he had tucked the wire inside at the request of the employee.

52. TFO Opelt asked Scerbo if he was carrying any weapons of any kind. Scerbo replied he was not.

53. When asked, Scerbo advised he was not carrying any illegal drugs or carrying prescription medication not in his name.

54. TFO Opelt asked Scerbo if he was carrying any large amounts of United States Currency. Scerbo hesitated, and failed to respond initially.

55. Scerbo advised he had approximately $40,000. TFO Opelt asked Scerbo if the currency was in his checked bags or his carry on should bag. Scerbo advised it was in his checked bags.

56. TFO Opelt asked Scerbo the purpose for carrying such a large amount of money. Scerbo advised it was to purchase a commercial "Flexmod" structure.

57. TFO Opelt asked Scerbo the purpose of the structure. Scerbo advise it was a secure building for the processing of cannabis.

58. When asked how he had obtained the currency, Scerbo advised he had received a loan from "a guy who is worth millions." Scerbo declined to identify the "guy".

    C. Discovery of Subject Property

59. TFO Opelt asked Scerbo if officers could search his bags to verify his statements. Scerbo provided verbal consent to search his bags.

60. Scerbo handed his carry-on shoulder bag to DEA Task Force Officer Anthony Terranova. TFO Terranova searched Scerbo black shoulder bag in front of him, and initially located one bundle of United States Currency in a side pocket.

61. TFO Terranova asked Scerbo if that was all of the United States Currency in the bag. Scerbo indicated it was.

62. Two additional bundles of United States Currency was located by TFO Terranova inside a yellow envelope inside the bag.

63. TFO Terranova asked Scerbo how much currency was in the bag. Scerbo indicated $20,000.

64. Scerbo was advised by TFO Terranova that the envelope appeared to be $20,000 and then asked how much more was in the side pocket of the bag. Scerbo advised the currency in the envelope was $20,000, but the currency in the side pocket was his.

9

65. TFO Opelt asked Scerbo if the United States Currency in his shoulder bag was in a part of the $40,000 he had initially indicated. Scerbo advised it was in addition to the $40,000 he had indicated.

66. Scerbo advised he had documentation of having withdrawn the United States Currency from a bank. Scerbo advised he had some documentation with him, and there was additional documentation in his checked bags with the United States Currency there.

67. TFO Opelt was given receipts from Bank of America to review, showing a $35,000 deposit to his personal account with a previous balance of $96.08. The receipt showed two wire transfers out of the account for $5,000 and $30,000.

68. Scerbo also presented TFO Opelt with a wire transfer receipt in the amount of $29,482 from himself to Flexmod LLC on 10/2/2018. None of the documentation in any way showed a source of the United States Currency.

69. TFO Opelt asked Scerbo if he had any employment in his home state of New York. Scerbo advised he was a yoga instructor and involved in properties.

70. TFO Opelt asked if Scerbo meant real estate. Scerbo advised not really.

71. Scerbo was advised that the currency was being seized pending additional investigation.

    D. Scerbo's Departure and Seizure at San Francisco International Airport

72. TFO Opelt asked Scerbo if he would likek to board his flight or come to the DEA O'Hare office for a receipt.

73. Scerbo was advised he was still not under arrest, and he was still free to leave. Scerbo advised he wished to board his flight to San Francisco.

10

74. TFO Terranova learned that United Airlines had forwarded Scerbo's checked bags on an earlier flight to San Francisco flight UA499.

75. Scerbo was advised a search of his bags would be conducted in San Francisco by DEA agents at that location. Scerbo advised he understood and granted verbal consent for the search in San Francisco.

76. TFO Terranova asked Scerbo if he was certain the checked bags contained $40,000 United States Currency. Scerbo advised he was certain.

77. DEA Task Force Officer Blake Molyneux at San Francisco International Airport was contacted by TFO Terranova advising him of the events that occurred with Scerbo.

78. When Scerbo's bags arrived in San Francisco, California they were searched by TFO Molyneux. TFO Molyneux located $65,000 United States Currency.

79. Scerbo and the United States Currency were photographed. Scerbo was left with $331.00 for humanitarian reasons and boarded his flight to San Francisco.

80. A receipt for the United States Currency seized from Scerbo's carry-on shoulder bag was prepared and sent to Scerbo's home address by certified mail.

E. Canine Examination of the Subject Property

81. TFO Terranova utilized the Glen Ellyn Police Department certified narcotics detection canine, Madden, to examine the currency in Scerbo's possession.

83. Madden was last certified on October 2, 2018 by the Chicago Police Department.

84. Madden is trained and certified to detect five odors: (1) marijuana, (2) cocaine, (3) heroin, (4) ecstasy, and (5) methamphetamine.

85. If at any time during a search Madden smells one of the five odors he is trained to detect, Madden will alert with an active/passive alert at the area where he smells the odor.

86. Madden's search sniff was conducted on October 15, 2018 at the storage warehouse near the DEA Office at O'Hare Airport.

87. At the time of the search/sniff at the storage warehouse, there were lockers, a chain-link fence, a storage cage area, and a milk crate. Madden did not alert meaning this area was free from the odor of narcotics. TFO Opelt then placed the suspect United States Currency within this same area.

88. TFO Terranova directed Madden to search/sniff, and Madden alerted by sniffing intensely on and around the United States Currency exhibiting a change of behavior. Madden sat and stared at the milk crate, pinpointing the source of narcotic odor. TFO Opelt advised that was the location of Scerbo's currency.

F. Criminal History of Scerbo

89. On December 23, 2004, Scerbo was convicted in the United States District Court for the District of Pennsylvania, Western District, of conspiracy to possess with intent to distribute a controlled substance pursuant to Title 21, United States Code, Section 846.

90. Scerbo was sentenced to 57 months incarceration and to a term of 3 years of supervised upon release from imprisonment. On May 5, 2009, Scerbo probation was transferred to the Northern District of New York Main Office Syracuse, revoking his supervised release twice and sentencing him additional months of imprisonment, with a self-surrender date of February 23, 2012.

91. Most recently, Scerbo was arrested in April 2018 in New York for felony controlled substance and felony traffic violations.

III. Administrative Forfeiture Proceeds

92. On November 6, 2018, DEA initiated administrative forfeiture proceedings against the currency seized from Scerbo at O'Hare and San Francisco Airport by mailing a Notice Letter and Notice of Seizure to all potential interest holders by certified mail.

93. On December 11, 2018, Scerbo through his attorney Jonathan M. Brayman filed an administrative claim with DEA for funds in the amounts of $65,000 and $23,790.

94. On December 17, 2018, DEA referred this matter to the United States Attorney's Office in Chicago to initiate judicial forfeiture proceedings.

**First Cause of Action**

95. Plaintiff repeats and realleges the averments in paragraphs one through 94 as though fully set forth herein.

96. For the reasons set forth above, the subject property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it: (1) was "furnished or intended to be furnished" in exchange for a controlled substance or listed chemical in violation of Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801, *et seq.* (the "Controlled Substances Act"), (2) represents "proceeds traceable" thereto, or (3) was "used or intended to be used to facilitate" a violation thereof. *See* 21 U.S.C. § 881(a)(6).

97. Pursuant to 21 U.S.C. § 881(a)(6), "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [21 U.S.C. §§ 801-904], all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities

13

used or intended to be used to facilitate any violation of [thereof]" are subject to forfeiture to the United States. *Id.*

## Second Cause of Action

98. Plaintiff repeats and realleges the averments in paragraphs one through 94 as though fully set forth herein.

99. For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960; to wit, "dealing in a controlled substance" a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

100. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of 1956, 1957 or 1960 of [Title 18], or any property traceable to such property," is subject to forfeiture to the United States.

101. Pursuant to 18 U.S.C. § 1956:

> (3) Whoever, with the intent—
> (A) to promote the carrying on of specified unlawful activity;
> (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
> (C) to avoid a transaction reporting requirement under State or Federal law,
> conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

102. The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

103. The list of offenses under § 1961(1)(A) are further defined as "racketeering activity,"

14

and include "any act or threat involving . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year[.]" *See* 18 U.S.C. § 1961(1)(A).

### Third Cause of Action

104. Plaintiff repeats and realleges the averments in paragraphs one through 94 as though fully set forth herein.

105. For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960; to wit, interstate and foreign travel or transportation in aid of racketeering enterprises in violation of 18 U.S.C. § 1952, a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

106. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of 1956, 1957 or 1960 of [Title 18], or any property traceable to such property," is subject to forfeiture to the United States.

107. Pursuant to 18 U.S.C. § 1956:

> (3) Whoever, with the intent—
> (A) to promote the carrying on of specified unlawful activity;
> (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
> (C) to avoid a transaction reporting requirement under State or Federal law,
> conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

108. The term "specified unlawful activity" means "any act or activity constituting

15

an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

109. The list of offenses under § 1961(1)(A) are further defined as "racketeering activity," and include "any act which is indictable under . . . section 1952[.]" *See* 18 U.S.C. § 1961(1)(A).

110. Section 1952(a) describes the following as an indictable act:

> (a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
> (1) distribute the proceeds of any unlawful activity; or
> (2) commit any crime of violence to further any unlawful activity; or
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity[.]

18 U.S.C. § 1952(a).

111. Section 1952(b) further describes "unlawful activity" as, "any business enterprise involving . . . narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act)[.]".

## Fourth Cause of Action

112. Plaintiff repeats and realleges the averments in paragraphs one through 94 as though fully set forth herein.

113. For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to "dealing in a controlled substance," a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

114. Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c))" is subject to forfeiture to the United States. See 18 U.S.C. § 981(a)(1)(C)(2018).

16

115. The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

116. The list of offenses under section 1961(1)(A) are further defined as "racketeering activity," and include "any act or threat involving . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year[.]" *See* 18 U.S.C. § 1961(1)(A).

### Fifth Cause of Action

117. Plaintiff repeats and realleges the averments in paragraphs one through 94 as though fully set forth herein.

118. For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952 ([i]nterstate and foreign travel or transportation in aid of racketeering enterprises), a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

119. Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c))" is subject to forfeiture to the United States. *See* 18 U.S.C. § 981(a)(1)(C)(2018).

120. The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

121. The list of offenses under section 1961(1)(A) are further defined as "racketeering

17

activity," and include "any act which is indictable under . . . section 1952[.]" *See* 18 U.S.C. § 1961(1)(A).

122. Section 1952(a) describes the following as an indictable act:

>  (a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
>  (1) distribute the proceeds of any unlawful activity; or
>  (2) commit any crime of violence to further any unlawful activity; or
>  (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity[.]

18 U.S.C. § 1952(a).

123. Section 1952(b) further describes "unlawful activity" as, "any business enterprise involving . . . narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act)[.]"

## Prayer for Relief

WHEREFORE, based upon the aforementioned facts and circumstances, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. Supp. G(3)(b), respectfully, prays:

1) That process issue for an arrest warrant *in rem* for the subject property, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

2) That due notice be given to all parties to appear and show cause why forfeiture of the subject property to the United States in accordance with the claims herein set forth should not be decreed;

3) That this Court enter a judgment of forfeiture for the subject property to the United States; and

4) That this Court grant Plaintiff all other relief as it may deem just and proper, together with

the costs and disbursements of this action.

    DATED this __th day of March 2019.

    JOHN R. LAUSCH, JR.
    United States Attorney
    For the Northern District of Illinois

    By:   *Jeffrey R. Borup*
         JEFFREY R. BORUP
         Assistant United States Attorney
         219 South Dearborn Street, 5th Floor
         Chicago, Illinois 60604
         Desk: (312) 697-4087
         Email: jeffrey.borup@usdoj.gov

Attorneys for Plaintiff
United States of America

NORTHERN DISTRIT OF ILLINOIS   )
                                                          )   SS
COUNTY OF COOK                    )

## VERIFICATION

I, Scott Opelt, having first been duly sworn, upon oath, depose and state as follows:

1. I am a Task Force Officer with the Drug Enforcement Administration and have been so employed since November 2014.

2. My duties and responsibilities as a Task Force Agent with DEA involve investigation of alleged violations of the Controlled Substances Act, Title 21 of the United States Code.

3. I have read the foregoing complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief.

4. This statement is based upon my own personal knowledge as well as information I have received from other agents, persons, and documents; it does not include each and every fact known to me concerning this investigation, but is submitted for the limited purpose of establishing a basis to believe the property identified is subject to forfeiture.

5. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 11th of March, 2019, in Chicago, Illinois.

SCOTT OPELT
Task Force Officer
Drug Enforcement Administration